**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF OHIO**
**WESTERN DIVISION**

FILED
RICHARD W. NAGEL
CLERK OF COURT

JUN 10 2025 3 23 P

U.S. DISTRICT COURT
SOUTHERN DISTRICT
OF OHIO-DAYTON

|  |  |
|---|---|
| **UNITED STATES OF AMERICA,**<br><br>Plaintiff,<br><br>v.<br><br>**VINCENT NZIGIYIMFURA,**<br>**a.k.a. Vincent Mfura,**<br><br>Defendant. | **CASE NO.** 3:25-cr-00048<br><br>**JUDGE** Walter H. Rice<br><br>**INDICTMENT**<br>**18 U.S.C. § 1425(a)**<br>**18 U.S.C. § 1425(b)**<br>**18 U.S.C. § 1546(a)** |

THE GRAND JURY CHARGES:

At all times relevant to this Indictment:

## I.     The Rwandan Genocide

1.      Rwanda is a country in east-central Africa. In early 1994, Rwanda had a population of about 7 to 8 million people, which was comprised predominantly of two ethnic/social groups – Hutus (accounting for around 85 to 90 percent of the population) and Tutsis (8 to 14 percent). By that time, there had been decades of tensions between these two groups.

2.      On the evening of April 6, 1994, Rwandan President Juvénal Habyarimana, who was Hutu, was assassinated when his plane was shot down with a surface-to-air missile near the airport in Kigali. Many Hutus claimed that the Rwandan Patriotic Front ("RPF"), a Tutsi rebel force, was responsible for killing President Habyarimana.

3.      In the aftermath of the president's assassination, Hutu extremists took control of the Rwandan government and began killing their political opponents, including Hutu moderates and Tutsi leaders.

4.      Over the next 100 days, a wave of genocidal killings swept across Rwanda. Around 500,000 to 800,000 people – mainly Tutsis and others perceived to be assisting them – were slain. The killers were predominantly Hutu soldiers, members of Hutu militant groups, and other Hutu civilians. The perpetrators of the genocide erected roadblocks throughout the country as a means of stopping and identifying Tutsis and often used machetes, clubs, spears, guns, and other weapons to commit the killings.

5.      The genocide ended in July 1994 after the RPF took control of the country.

## II.     Defendant Vincent Nzigiyimfura's Participation in the Rwandan Genocide

6.      Defendant Vincent Nzigiyimfura was a Hutu businessman and butcher living in Rwanda prior to and during the genocide.   Nzigiyimfura's home was in Gihisi Cell, an area in Kavumu Sector of Kigoma Commune in Gitarama Prefecture.[1] Nzigiyimfura owned a shop in the nearby town of Nyanza, which was located in Nyabisindu Commune of Butare Prefecture. Prominent and widely known in the general area in which he lived and worked, Nzigiyimfura also owned several vehicles, including a blue Toyota Stout.

7.      Nzigiyimfura was a member of one or more extremist anti-Tutsi political groups that believed in Hutu supremacy, supported violence against Tutsis, and encouraged the genocide in Rwanda.

8.      During the approximate period of April through June 1994 (*i.e.*, the "Relevant Time Period"), Nzigiyimfura knowingly and intentionally participated and engaged in, and was a leader and organizer of, the genocide against Tutsis in the area in and around Gihisi, Nyanza, and the communes in which they were located. Over the course of the Relevant Time Period, Nzigiyimfura

---

[1] At the time of the genocide in 1994, Rwanda was divided into prefectures (akin to states), which were subdivided into communes (similar to counties). Communes were, in turn, split into sectors, which were further divided into cells.

2

deliberately persecuted and participated in violence against people based on their status as Tutsis, inciting, advancing, and amplifying the genocide in Gihisi, Nyanza, and elsewhere in a number of ways, including the following, among others:

a. Nzigiyimfura participated in and led meetings, gatherings, and discussions with other Hutus, including members of Hutu extremist groups, to encourage, plan, and execute the genocide.

b. Nzigiyimfura participated in the construction of multiple roadblocks by, among other things, transporting the materials used to build them in his blue Toyota Stout.

c. Nzigiyimfura oversaw roadblocks, which were manned by other Hutus to whom Nzigiyimfura gave orders at various times, including instructions to capture and kill Tutsis.

d. Nzigiyimfura provided weapons, transportation, and material inducements to other Hutus in order to encourage, coerce, secure, facilitate, and enable their participation in the genocide.

e. Nzigiyimfura directed, led, and transported armed Hutus throughout Gihisi and Nyanza to search for and apprehend Tutsis, some of whom were taken away and killed.

f. As the genocide progressed, Nzigiyimfura devised and executed a scheme that drew out Tutsis who had managed to elude capture and remain concealed. As part of the scheme, Nzigiyimfura spread the word that the killings had stopped and that Tutsis in hiding would be shown mercy if they came forward and were identified and registered. In this way, Nzigiyimfura and other genocide perpetrators were able to flush out hidden Tutsis, who were rounded up and murdered.

3

g. Nzigiyimfura willfully caused – and knowingly and intentionally ordered, induced, procured, commanded, aided, abetted, and participated in – the murder of multiple Tutsis, including men, women, and children. Nzigiyimfura likewise directly commanded the killing of at least one individual accused of assisting Tutsis. These killings were crimes under then-existing Rwandan law.

9. When the genocide against Tutsis came to an end in the area in and around Gihisi and Nyanza in June 1994, Nzigiyimfura fled Rwanda. After living for a time in the Democratic Republic of the Congo and Kenya, he eventually settled in Lilongwe, Malawi in or around 1999. While in Malawi, Nzigiyimfura resumed his life as a businessman and sought and obtained refugee status. Nzigiyimfura resided in Malawi until ultimately departing for the United States.

## III. Nzigiyimfura's Immigration to the United States and Fraudulent Procurement of a Lawful Permanent Resident Card

10. As a result of his deeds and crimes during the genocide in Rwanda, Nzigiyimfura was ineligible to immigrate to the United States. Notwithstanding his disqualifying history of genocidal acts, Nzigiyimfura fraudulently sought and secured permission to come to the United States as a Lawful Permanent Resident ("LPR").

11. To that end, during the approximate time period of February 2008 through March 2009, Nzigiyimfura knowingly and willfully submitted and caused to be submitted to the U.S. Department of State (the "State Department") two materially misleading Applications for Immigrant Visa and Alien Registration (Forms DS-230), in which he knowingly and intentionally concealed his participation in the Rwandan genocide. The DS-230 forms contained general descriptions of the categories of prospective immigrants who are excluded from admission into the United States, including people who have been convicted of, or have admitted committing, crimes of moral turpitude and people who have engaged in genocide. The forms expressly instructed

4

Nzigiyimfura to read the listed categories carefully and to indicate whether he was or was not a member of the classes of people who were ineligible to immigrate to the United States. In completing and willfully causing the completion of the DS-230s, Nzigiyimfura falsely represented on the forms that he was not a member of any excludable class, specifically responding that he was not an alien who had engaged in genocide. Nzigiyimfura knew, however, that he had, in fact, engaged in genocide against Tutsis, including by openly directing and participating in the commission of multiple murders. Nzigiyimfura also knew that the information he provided in the DS-230s would be used by the State Department to determine his eligibility for an immigrant visa and by the U.S. Department of Homeland Security ("DHS") to issue him an LPR card.

12. In around early 2009, Nzigiyimfura signed, and adopted the signature on, the final page of one of the DS-230s in the presence of a U.S. consular officer at the embassy in Lilongwe, Malawi. Above Nzigiyimfura's signature, the DS-230 page stated, in part: "I understand that any willfully false or misleading statement or willful concealment of a material fact made by me herein may subject me to permanent exclusion from the United States and, if I am admitted to the United States, may subject me to criminal prosecution and/or deportation."

13. In addition to the DS-230s, Nzigiyimfura knowingly and willfully submitted and caused to be submitted to the State Department an affidavit, dated on or about November 21, 2008, containing material misrepresentations and omissions intended to hide his genocidal past. In the signed and sworn affidavit, Nzigiyimfura misleadingly claimed that he "left Rwanda in 1994 due to the Genocide" without mentioning the critical fact that he had fled the country because of his participation in the persecution and massacre of Tutsis. Later in the affidavit, Nzigiyimfura also falsely asserted that he was "a responsible man" and "father of 8" who could not "behave badly in society," which was "why no record of criminal in nature [sic] can appear either in Rwanda as well

as Malawi" – again deliberately failing to disclose his disqualifying criminal conduct during the Rwandan genocide.

14.     Based on the material misrepresentations and omissions embodied in the DS-230s and the affidavit, the State Department issued Nzigiyimfura an immigrant visa, which he used to enter the United States through fraud on or about April 13, 2009.

15.     Based upon the materially false and misleading DS-230 forms and affidavit and upon his fraudulently procured immigrant visa, DHS issued Nzigiyimfura an LPR card with an expiration date of April 30, 2019.  An LPR card – which is also referred to as a green card, alien registration receipt card, permanent resident card, or I-551 – is a document evidencing that the holder is a lawful permanent resident who is entitled to live and work in the United States.

## IV.     Nzigiyimfura's Fraudulent Application for U.S. Naturalization

16.     Given his conduct and crimes during the Rwandan genocide in 1994 and his efforts to mislead U.S. Government officials when fraudulently obtaining and procuring his immigrant visa and LPR card, Nzigiyimfura was ineligible to obtain U.S. citizenship through naturalization. Nonetheless, nearly five years after he entered the United States, Nzigiyimfura – who was living in Kettering, Ohio – initiated the process of fraudulently applying to naturalize despite knowing that he was not eligible to become a U.S. citizen.

17.     On or about January 23, 2014, Nzigiyimfura knowingly and willfully submitted and caused to be submitted to U.S. Citizenship and Immigration Services ("USCIS") an Application for Naturalization (Form N-400), in which he knowingly made materially false statements and omitted material facts in order to hide once again his involvement in the genocide against the Tutsis, as well as his prior visa and immigration fraud.  More specifically, in the N-400, which

6

was mailed to USCIS from Dayton, Ohio, and which he had signed under penalty of perjury, Nzigiyimfura knowingly and intentionally misrepresented, that:

      a.      he had never been a member of or associated with any organization, association, fund, foundation, party, club, society, or similar group in the United States or in any other place (when, as he well knew, he had actually been a member of one or more extremist Hutu political groups in Rwanda);

      b.      he had never persecuted, either directly or indirectly, any person because of race, religion, national origin, membership in a particular social group, or political opinion (when, as he well knew, he had persecuted people during the Rwandan genocide of 1994 because they were Tutsis);

      c.      he had never committed a crime or offense for which he was not arrested (when, as he well knew, he had participated in murders and other crimes and had not been arrested);

      d.      he had never given false or misleading information to any U.S. Government official while applying for any immigration benefit or to prevent deportation, exclusion, or removal (when, as he well knew, he had given false and misleading information to the State Department and to DHS in connection with his DS-230s); and

      e.      he had never lied to any U.S. Government official to gain entry or admission into the United States (when, as he well knew, he had lied to the State Department and to DHS to come into the country).

In addition to making the foregoing material misrepresentations, Nzigiyimfura indicated in the N-400 that he wished to change his name legally to Vincent Mfura (an alteration that would have had

the benefit of helping him conceal his identity as a leader of the genocide against the Tutsis in the area of Gihisi, Nyanza, and elsewhere).

18. Together with the materially misleading N-400, Nzigiyimfura knowingly and willfully submitted and caused to be submitted to USCIS a copy of his fraudulently procured LPR card, thereby using it to demonstrate his identity and LPR status for purposes of applying for U.S. naturalization.

19. On or about November 14, 2014, in Cincinnati, Ohio, Nzigiyimfura appeared for an in-person interview with a USCIS officer, during which he again knowingly and intentionally made material misrepresentations to hide not only his participation in the genocide but also his earlier deceptions. Over the course of the interview, the USCIS officer placed Nzigiyimfura under oath, reviewed his N-400 with him, and asked him to confirm the substance of his written responses to certain of the questions on the form. In response to the USCIS officer's queries, Nzigiyimfura verbally reaffirmed his prior materially false and fraudulent denials relating to: (i) membership in or association with any organization, association, fund, foundation, party, club, society, or similar group; (ii) persecution of any person because of race, religion, national origin, membership in a particular social group, or political opinion; (iii) giving false or misleading information to any U.S. Government official while applying for any immigration benefit or to prevent deportation, exclusion, or removal; and (iv) lying to any U.S. Government official to gain entry or admission into the United States. While he revealed a prior conviction for driving under the influence in Kettering, Ohio that he had failed to disclose on the N-400 at the time of its initial submission in January 2014, Nzigiyimfura claimed during the interview that he had not committed, or been charged with, any other crimes. At the conclusion of the interview, he again signed the N-400 – this time in the presence of the USCIS officer – swearing and certifying under penalty of perjury

8

that the contents of the application, including any corrections made during the interview, were true and correct to the best of his knowledge and belief.

20. In connection with his naturalization interview on or about November 14, 2014, Nzigiyimfura knowingly presented and provided to the USCIS officer: (i) a Malawian passport containing the fraudulently procured immigrant visa that Nzigiyimfura had obtained from the State Department in early 2009; and (ii) his fraudulently procured LPR card.

21. Nzigiyimfura's application for naturalization has not been granted.

## IV. Nzigiyimfura's Renewal and Use of His Fraudulent Lawful Permanent Resident Card

22. In late 2018, Nzigiyimfura, who was continuing to await naturalization, sought to renew and replace his original fraudulently procured LPR card, which was set to expire on April 30, 2019. To do so, he knowingly and willfully submitted and caused to be submitted to USCIS an I-90 application for a replacement card, as well as a copy of his expiring LPR card. The I-90 and supporting documentation were mailed from Dayton, Ohio to USCIS on or about October 16, 2018. As a result, Nzigiyimfura was issued a new fraudulently procured LPR card with an expiration date of September 11, 2029.

23. On or about July 27, 2021, in Dayton, Ohio, Nzigiyimfura knowingly used his replacement fraudulently procured LPR card in connection with an application for an Ohio driver's license. Specifically, Nzigiyimfura knowingly presented the LPR card, while appearing in person, to the Ohio Department of Public Safety, Bureau of Motor Vehicles ("Ohio BMV"), as proof of his name, date of birth, and legal presence in the United States.

9

## COUNT 1
### Attempted Procurement of Naturalization Unlawfully
### [18 U.S.C. § 1425(a)]

Paragraphs 1 through 23 above are hereby realleged and incorporated as if fully set forth herein.

From on or about January 23, 2014, through on or about November 14, 2014, in the Southern District of Ohio and elsewhere, Defendant Vincent Nzigiyimfura knowingly attempted to procure, contrary to law, his own naturalization as a U.S. citizen, by:

      a.     knowingly and willfully submitting and causing to be submitted to USCIS an N-400 application for naturalization, in which he knowingly made materially false statements, claims, and representations and concealed and covered up material facts;

      b.     knowingly and willfully submitting and causing to be submitted to USCIS a copy of his fraudulently procured visa and LPR card as part of the documentation supporting his N-400;

      c.     knowingly making materially false statements, claims, and representations and concealing and covering up material facts verbally while under oath during his naturalization interview; and

      d.     knowingly presenting to USCIS his fraudulently procured immigrant visa and his fraudulently procured LPR card in connection with his naturalization interview.

All in violation of 18 U.S.C. § 1425(a).

## COUNT 2
### Attempted Procurement of Naturalization Unlawfully
### [18 U.S.C. § 1425(b)]

Paragraphs 1 through 23 above are hereby realleged and incorporated as if fully set forth herein.

10

From on or about January 23, 2014, through on or about November 14, 2014, in the Southern District of Ohio and elsewhere, Defendant Vincent Nzigiyimfura, knowing that he was ineligible to naturalize, knowingly applied for, and attempted to procure and obtain, naturalization for himself, to which he was not entitled, in that:

      a.     he was not lawfully admitted to the United States because he had obtained his immigrant visa and LPR status through material misrepresentations and omissions and through fraud;

      b.     he was not lawfully admitted to the United States, and was not a person of good moral character, because he had ordered, incited, assisted, and otherwise participated in genocide, as defined in 8 U.S.C. § 1091(a), against Tutsis in Rwanda in 1994; and

      c.     he was not a person of good moral character because he provided false testimony for the purpose of obtaining immigration benefits.

All in violation of 18 U.S.C. § 1425(b).

## COUNT 3
### Fraud and Misuse of Visas, Permits, and Other Documents
### [18 U.S.C. § 1546(a)]

Paragraphs 1 through 23 above are hereby realleged and incorporated as if fully set forth herein.

On or about July 27, 2021, in the Southern District of Ohio and elsewhere, Defendant Vincent Nzigiyimfura knowingly possessed his LPR card (*i.e.*, an alien registration receipt card), and knowingly used that LPR card by presenting it to the Ohio BMV as proof of his name, date of birth, and legal presence in the United States, knowing the LPR card to have been procured by means of false claims and statements and to have been procured by fraud and unlawfully obtained.

All in violation of 18 U.S.C. § 1546(a).

11

A TRUE BILL

_____

FOREPERSON

KELLY A. NORRIS
ACTING UNITED STATES ATTORNEY

_____
GEORGE PAINTER (0097271)
Assistant United States Attorney

MATTHEW R. GALEOTTI
HEAD OF THE CRIMINAL DIVISION
UNITED STATES DEPARTMENT OF JUSTICE

_____
BRIAN MORGAN (NY 4276804)
Trial Attorney

12